Filed 9/18/15  Angel C. v. Super. Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ANGEL C. et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF MENDOCINO COUNTY,<br><br>        Respondent;<br><br>S.C., a minor, and MENDOCINO COUNTY HEALTH & HUMAN SERVICES AGENCY,<br><br>        Real Parties in Interest. | A145268<br><br>(Mendocino County<br>Super. Ct. No. SCUK-JVSQ-14-16951-01) |

The Mendocino County Health & Human Services Agency (Agency) detained S.C. after it received reports that S.C.'s mother, Angel C., a member of the Hopland Band of Pomo Indians (Tribe), was using drugs and leaving S.C. with an inappropriate caregiver.  S.C.'s father, C.C., was serving a sentence in state prison at the time, but was released about four months after S.C. was detained.  The juvenile court found that it had jurisdiction over S.C. pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (j),[1] and ordered an out-of-home placement for S.C. and reunification services for the parents.  At the 12-month review hearing the court terminated reunification services and set a section 366.26 hearing.

---

    [1] Further statutory citations are to the Welfare and Institutions Code unless indicated otherwise.

1

Angel and C.C. have filed separate petitions for extraordinary writ seeking to reverse the termination of reunification services and the setting of the section 366.26 hearing. The parents argue that insufficient evidence supported the juvenile court's findings that (1) return of S.C. to the parents' home would pose a substantial risk of detriment to S.C.; (2) reasonable services had been offered and active efforts to reunify the family had been made; (3) reunification within the 18-month statutory period was not likely; and (4) there was good cause to deviate from the placement preferences of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).

We conclude that the challenged court findings were supported by substantial evidence and deny the petitions.

## BACKGROUND

### A. *Detention*

In February 2014, when S.C. was 13 months old, the Agency received reports that Angel had been using drugs while caring for S.C. and would sometimes leave S.C. in the care of her sister, who had mental health issues and also used drugs. The Agency detained S.C. on February 26, 2014, after Angel was arrested for being under the influence of a controlled substance.[2]

On February 28, 2014, the Agency filed a section 300 petition on behalf of S.C. making allegations under subdivisions (b), (g) and (j). Attached to the petition was an ICWA-010(A) form noting that Angel was an enrolled member of the Tribe and that S.C. may be a member or eligible for membership.

Three older children born to Angel had previously been removed from her care and were in the guardianship of relatives because she had failed to reunite with them. One of the older children was a full sibling of Angel and the parental rights of both Angel and C.C. were terminated on October 15, 2009. Angel had a lengthy record of arrests dating back to 1997, some for use of a controlled substance. At the time S.C. was

---

[2] Angel refused to submit to drug testing after her arrest. The record does not indicate that charges were filed against Angel.

detained, C.C. was serving a sentence in state prison and was not scheduled for release until July 2014.

At a March 3, 2014 detention hearing, the court ordered that S.C. remain detained, giving the Agency discretion to return S.C. to Angel's care after further investigation.

**B.**     *Jurisdiction*

On March 18, 2014, when the Agency filed a supplemental petition and a jurisdiction report, S.C. was in a licensed foster home but was in the process of being moved to a tribally approved foster placement.

According to the jurisdiction report, C.C. had been convicted for disorderly conduct in 1996. In 1997 he had been arrested for inflicting corporal injury on a spouse, cruelty to a child and terroristic threats, but the charges were eventually dismissed. In 2006, he had been arrested for cruelty to an elder or dependent adult (Pen. Code, § 368, subd. (a)), but charges were later dismissed. In 2008, C.C. was arrested on drug charges after police officers observed him to be under the apparent influence of a stimulant and in the possession of a methamphetamine pipe. He admitted to police officers that he had smoked methamphetamine. In 2009, he was convicted for inflicting corporal injury on a spouse or cohabitant (Pen. Code, § 273.5, subd. (a)) and was put on probation. Angel was the victim in that case. In 2011, C.C.'s probation was revoked because of a new violation of Penal Code section 273.5, subdivision (a), resulting in his current incarceration in state prison.

At a jurisdiction hearing on May 12, 2014, the parents and the Agency presented a settlement to the court by which several of the allegations in the petition were dismissed. The parties agreed to three months of reunification services, with random drug testing, after which the court would review progress. By agreeing to the settlement, the parents avoided the risk that the court would bypass reunification services at the disposition hearing.[3]

---

[3] Because S.C. had a sibling who was removed from the parents' care and both Angel and C.C.'s parental rights to the sibling were subsequently terminated, the trial court may have had the option to bypass reunification services in S.C.'s case pursuant to

3

The court found true two section 300, subdivision (b) allegations:  (1) Angel was living in unsanitary living conditions, and (2) C.C. had a lengthy criminal arrest history for violence and drug-related charges, showing a pattern of unsafe and violent behaviors that would place S.C. at risk, and he was currently incarcerated for a violent felony.  The court also found the section 300, subdivision (j) allegation to be true—Angel had previously lost custody of three older children, failing to reunify with them.

## C.    *Disposition*

The Agency filed a disposition report on May 23, 2014.  The Tribe had confirmed that S.C. was a member of the Tribe or was eligible for membership but had not requested to take jurisdiction or have the case transferred.  S.C. had been placed in a tribally preferred foster home, and her emotional well-being had "noticeably improved" in this home.  S.C. presented as "much calmer and happier" when brought to the Agency for supervised visits with Angel.

Angel had not yet participated in any reunification services or accepted any responsibility for the issues resulting in S.C.'s detention, but she had stated that she would "do any and all of the services recommended to her by the Agency and the Tribe" in order to reunify with S.C.  All of Angel's drug tests since the beginning of the case had been negative.  The Alcohol and Other Drugs Program (AODP)[4] had assessed Angel and determined there was no need for its services because she did not appear to have a current drug problem.

The Agency recommended three months of reunification services to the court, as had been previously agreed with the parents.  Angel would be offered the following services:  intake support group, family counseling, parenting classes, housing assistance, vocational rehabilitation and assessment and counseling.  C.C. would also be offered

section 361.5, subdivision (b)(3), depending on the specific jurisdictional findings that had been made in the sibling's case.

[4]  The parties' briefs and Agency reports use a number of acronyms for services provided to the parents.  We adopt three of these acronyms because of the frequency the names of the services are used:  Alcohol and Other Drugs Program (AODP), Alternatives to Violence (ATV), and Family Empowerment Group (FEG).

4

reunifications services—drug treatment, treatment as recommended by AODP, a domestic violence program, and other services deemed appropriate when he was released from prison.

The Agency filed an addendum to the disposition report on June 11, 2014. The addendum presented a preliminary assessment of S.C. by Cindy McCarthy, a licensed clinical social worker from the Sonoma County Indian Health Project. McCarthy stated: "[S.C.] appears to suffer Reactive Attachment Disorder, Inhibited Type" and it was likely she had "suffered trauma/emotional wounding during the first year of life which was sufficiently damaging to have caused elements of psychological arrest." "Thus, when feeling threatened, frightened, she reverts and regresses to the point of developmental arrest and sounds and behaves like a child of that age." McCarthy recommended an evaluation by a developmental program, noting that S.C.'s signs of intelligence and discrimination were "prognostically promising." She also suggested it "would be important to know what substances [S.C.] may have been exposed to in-utero, as she exhibits symptoms of drug (esp. cocaine) babies who lack an internal sense of being full after eating, and cry continually for food when their stomachs are actually full."

Following a June 12, 2014 disposition hearing, the court declared S.C. a dependent of the court and placed her in the custody of the Agency. The court ordered supervised visitation with Angel and C.C. of one-and-a-half hours weekly and ordered reunification services, adopting the Agency's case plan. Three-month and six-month review dates were also set.

## D.    *Three-Month Review*

The Agency filed a three-month review report on August 26, 2014. Angel had completed intake support but missed her first FEG on August 6, 2014, expressing unwillingness to take public transportation to the Ukiah Family Center. She had begun parenting classes on August 7, 2014, and the ATV program on July 15, 2014.

C.C. had been released from prison on July 17, 2014 and was residing with Angel. After an AODP assessment, it was determined that C.C.'s amphetamine and marijuana

dependence was in remission and he did not meet the criteria for AODP services. He began the ATV program on August 5, 2014.

The Agency's report concluded that because C.C. had only recently been released from prison, "it is not determinable that the mother and father can maintain a relationship free from domestic violence, as there has not been sufficient time to assess the quality of the parental relationship in the home." The Agency recommended that reunification services continue and a six-month review take place.

The court held a review hearing on September 10, 2014, and ordered no changes in disposition.

E.      *Six-Month Review*

The Agency filed a six-month review report on November 24, 2014. In August, the foster mother informed the agency that she would be returning to work and would be unable to provide the level of care S.C. required. A tribally approved foster home could not be found, so the tribal representative approved the Agency finding an alternative placement. On September 11, 2014, S.C. was moved to a new placement and had "noticeably progressed emotionally and developmentally in her new home." She was using more words, and tantrums had decreased.

Angel and C.C. were living together in Angel's grandmother's two-bedroom apartment. Angel was actively seeking housing and did not yet have a job. She had attended seven out of eleven FEG groups. According to the FEG progress report, Angel believed that Agency intervention in S.C.'s case was "unfair, ill informed and based on 'rumors.' " Angel expressed anger and "claims no responsibility for the issues and allegations that brought her to the attention" of the Agency. At group meetings, Angel tended to interrupt and had offered inappropriate, unsolicited feedback to other participants. "She appears defensive when facilitators have attempted to direct attention to her role and 'core issues' and on October 22nd, 2014, she became emotional, crying and raising her voice (higher than normal) and left group early expressing her anger and frustration." The FEG report concluded: "[A]s of submission of this report, we have not been successful in addressing the core issues of this case."

6

Angel enrolled in a parenting course, Baby's Playhouse, at the course midpoint. The facilitator had agreed to see Angel individually to make up the past material, but the facilitator now assessed Angel as not having benefitted from the program. Angel appeared to focus on socializing with other parents. She attended four Baby's Playhouse groups and was referred to another course, Toddling Toddlers, because of S.C.'s age. Angel began Toddling Toddlers on October 2, 2014. After attending three classes, the team requested that Angel not be allowed back in the group "due to her inappropriate and unsafe behaviors that put other group members and children at risk of harm." The social worker told Angel that she would be reoffered the class in the next cycle. In the first group meeting, Angel had an altercation with another client while the client was holding a child and other children were present. In the second class, Angel was observed making faces toward the same client. In the third class, Angel was observed making inappropriate sexual gestures towards C.C.

Angel had attended ATV classes regularly since July 15, 2014. The facilitator's report stated that Angel's level of participation was good, she was attentive, and she appeared to appreciate the program and the process. She attended groups with C.C. and tended to dominate discussions where he was concerned, regularly taking control of the conversation and speaking of C.C.'s shortcomings in his presence, with others witnessing the interchange nearby. This would make C.C. uneasy, causing him to distance himself from the conversation. The report also stated that Angel "has yet to take responsibility for why she is required to engage in this process. She will regularly place the blame on her sister's lack of judgment while caring for her child." Angel would not refer to her past substance abuse and did not appear to be aware the effect that abuse had on her children and family. The facilitator intended to meet with Angel and C.C. to inform them of his desire to separate them. He reported that Angel appeared to be the dominating member of the relationship, and C.C. appeared reluctant to challenge her position in a public forum. So far, C.C. had "held his composure under numerous character assaults" by Angel, but the facilitator was concerned that C.C. might be "challenged beyond his ability to withhold."

7

Angel had regularly attended therapy since July 30, 2015, both individual and couples therapy with C.C. "Per the therapist, [Angel] presents as a mother who is dedicated to providing her child with a nurturing environment, evidenced by the mother actively seeking housing and employment. The therapist is impressed with [Angel's] advocacy for herself and her family and encourages continued progress in therapy."

Angel was late to one visit with S.C. but otherwise consistently arrived on time to her weekly visits. Angel routinely brought S.C. "gummy snacks, cookies, and juice boxes" although she had been encouraged to bring healthier snacks. She had also been observed giving S.C. her cell phone to play casino games during visits. The social worker wrote: "It is apparent that [Angel] cares for the child, and the social worker would like to see more positive behaviors from the mother to ensure that the mother can protect the child from emotional and physical harm."

Angel continued to test negative for all substances. A positive test on August 29, 2014, was excused because of a prescription due to a medical procedure she had a few days before.

Regarding Angel, the report summarized: "Though the mother is physically present for services, the Agency remains concerned that the mother may be unable to benefit from services due to mental health issues. It has been observed in multiple settings that the mother's behaviors are at times erratic, unsafe, and unpredictable. Additionally, across settings, the mother's inability to accept responsibility for her role in the detention of her daughter suggests that she has not benefitted from the services that have been offered to her to date." The social worker requested an order for a psychological evaluation.

C.C. had been seeking employment, but because of his felony record had been able only to work odd jobs for friends and family members. He had completed intake support group and would soon begin FEG. He was currently taking Toddling Toddlers and regularly presented as a caring parent to S.C., though he had missed two classes. In the first three weeks, when Angel was present, C.C. did not have an opportunity to engage and bond with S.C., but after Angel had been dropped from the class, he

8

"noticeably became more present and able to begin working on forming a healthy bond with the child." However, C.C. had not been participating in the lecture portion of class, raising the concern that he might not be able to pass the post-class test.

During supervised visits with S.C., C.C. responded patiently and attentively to her when S.C. cried and screamed. He asked for support and guidance in providing alternative parenting tactics to help soothe the child, and he regularly practiced those tactics. The report stated that C.C. "clearly cares for and loves his daughter, and is continuing to strengthen the parent-child bond."

C.C. tested positive for alcohol on July 17 and October 20, 2014. Concerning the first positive test, C.C. said he had a celebratory drink after his release from prison and claimed it was an isolated incident. He tested negative for all drugs on November 5, 2014, after being called in for a test on November 3 and informing the Agency he was unable to do so because he was working. The social worker stated that C.C. would be re-referred to AODP to reassess his need for substance abuse treatment.[5] Abstinence from alcohol was a current condition of C.C.'s probation.

C.C. had also been attending therapeutic services "irregularly" at Consolidated Tribal Health.

The Agency recommended continued reunification services for both parents and a continued out-of-home placement for S.C. with a twelve-month review.

On December 5, 2014, Angel filed a declaration to respond to the Agency's status report. She asserted that she had been employed as a caregiver for her grandmother since October 2011, and she earned, on average, $800 per month. Angel disputed the reports that she had acted inappropriately in the Toddling Toddler's group. She denied bringing unhealthy snacks for S.C. during visitation and listed healthy snacks that she provides. She denied a failure to accept responsibility for her role in S.C.'s detention. She asserted that if S.C. had Reactive Attachment Disorder, there was no evidence of what caused the

---

[5] There is no indication in the record that the Agency actually referred C.C. back to AODP at or soon after the six-month review.

9

disorder and it was "more likely attributed to her detention from me and placement in the home of a stranger." She denied the need for a psychological evaluation and included a July 2012 progress note from a psychiatrist stating that she had no psychiatric illness and was psychologically normal in her functioning. She asserted that she saw the psychiatrist again in April 2014 and he confirmed his original diagnosis.

The court held a six-month review hearing on December 10, 2014. Both parents argued that the agency had not met its burden of showing a continued risk of detriment to S.C. if she were returned to the parents' home. The representative for the Tribe supported the Agency's recommendation. Following argument, the court found that Angel and C.C. had not made progress in addressing the problems that caused S.C. to be removed or that create barriers to returning her. S.C. appeared to have "a few issues that are the result of suspected neglect or developmental delay," and "the parents need to have a significant amount of training to be able to deal with this child who may well have special needs." The court found significant the fact that Angel had been dropped from a mandated parenting class and that neither Angel nor C.C. was making the necessary progress in the domestic violence group because they were attending together. The court was also concerned that there were some issues at visitation and denial about issues that needed to be addressed. The court adopted the findings and orders recommended in the Agency report, but lengthened supervised visitation to two hours weekly.

**F.      *12-Month Review***

The Agency filed a 12-month status report on April 1, 2015. Due to tribal rent support, Angel and C.C. moved into a two-bedroom residence in Lake County on February 7, 2015. An Agency inspection of the home had not been completed because Angel did not appear at the home at the scheduled time. Angel and C.C. had not yet secured steady employment.

On January 5, 2015, Angel switched FEG groups because she was dissatisfied with the progress report her initial group facilitators gave the Agency. She had attended seven of nine group meetings after switching. Her FEG progress report stated that she demonstrated enthusiasm and reached out to others to offer support. Initially, "she

10

presented her anger with [Agency] involvement and her intent to defend herself through knowledge of law and website information." "Recognition of past parenting issues (loss of other children) and the cause of the current detention are deflected through blaming situations and others then focusing on future intentions." She had progressed in aspects of her case but needed "an understanding of the requirements for successful closure."

Angel had not yet completed a parenting class. Since being dropped from Toddling Toddlers she had participated in one-on-one communications class review with an instructor and was responsive to the guidance provided. After her February move, Angel began the Motherhood is Sacred parenting class, but progress had not yet been documented. The Agency had confirmed that she was actively attending and participating.

Angel had been inconsistent in complying with Agency requests for drug testing. On January 21, 2015, she tested negative for all substances. On February 3, 2015, her behavior prior to testing suggested drug use—she had a dry mouth, her speech was loud and "hyper verbal," and she was fidgety. In the testing room, Angel appeared to be tampering with the sample being collected, putting both hands between her legs. She did produced a urine sample that tested negative for all substances and had a creatinine level of 29.0. The following day, Angel was 15 minutes late for testing. The sample provided tested negative for all substances and had a creatinine level of 28.7. This creatinine level was exactly the same as that found in C.C.'s February 3, 2015 drug test. A laboratory technician told the social worker that the probability of two partners having the same creatinine reading within 24 hours was one in one billion. The technician added that producing the same creatinine levels as one's partner was indicative of using the same urine for each sample.

On February 9, 2015, the agency contacted Angel about her drug tests results and suspicions that she had tampered with her tests. The Agency informed Angel that she was required to provide another urine sample that afternoon, but Angel refused to come to the office for the test, claiming that she and C.C. had other things to do. Angel was tested again on February 23, 2015, with negative results for all substances and a

11

creatinine level of 125.0. On March 9, 2015, the Agency contacted Angel and required her to come in for a drug test that day. Angel was 15 minutes late and was unable to produce a sample. Angel was told that she would be expected to drug test when the social worker arrived for a scheduled home inspection later that day, but Angel did not appear at that appointment. The Agency required another drug test on March 19, 2015. The test that day was negative for all substances with a creatinine level of 126.8.

After the Agency had reason to suspect that Angel and C.C. had submitted the same urine for their drug tests, the Agency required a drug test of C.C. on February 9, 2015. C.C. agreed to come to the Agency office, but later called to say he could not come in because of a doctor's appointment. The Agency required another drug test on February 19, 2015, after C.C. met with the social worker. When a male arrived to obtain a sample, C.C. "became defensive and claimed he had to run a 'quick errand.' " C.C. was unable to produce a sample and left the office. He returned forty minutes later and supplied a sample that was negative for all substances with a creatinine level of 28.0. On March 9, 2015, C.C. was 15 minutes late for testing, and he produced a sample that was negative for all substances with a creatinine level of 28.2. The lab technician reported to the agency that it was highly unlikely that a person would produce three urine samples at different dates and times with creatinine levels that were nearly the same. The technician added that it was likely that the same urine had been divided and used for each sample yielding the results. On March 19, 2015, C.C. arrived 43 minutes late for drug testing. The sample he produced that day was negative for all substances with a creatinine level of 62.0.

Angel and C.C. had arrived on time to all but two visits with S.C. On January 29, 2015, visits were expanded from "[l]evel-III" to "[l]evel-IV."[6] The first level-IV visit went without incident. The parents arrived about five minutes late for the second level-IV visit and were 25 minutes late returning S.C. to the Ukiah Family Center, having failed to inform staff they would be late. On February 18, 2015, the social worker

---

[6] Level-IV visits are off-site, unsupervised visits.

informed the parents that visits would return to level-III "due to confirmation of tampered drug tests and a refusal to drug test." On March 19, 2015, the parents were not present for their 10:30 a.m. visit and the visit was canceled at 10:45 a.m.

Prior to moving to Lake County, Angel continued to participate in the ATV program, but since her move she had not participated in such a program, despite a referral to a program provided by Lake County Tribal Health.

The social worker scheduled a psychological evaluation for Angel on January 15, 2015, and informed Angel on December 17, 2014. Angel refused to complete the evaluation. An evaluation was then scheduled for January 29, 2015, but Angel again refused and requested that the Tribe find a provider to do the evaluation. After the Tribe advised that it would not pay for an evaluation by a tribal provider and the Agency advised that it would recommend termination of reunification services at the 12-month status hearing, Angel said she would complete an evaluation with the Agency's provider. An evaluation was scheduled for March 26, 2015.

C.C. began participating in FEG on February 9, 2015, and had attended four out of five classes. He had completed five out of eight Toddling Toddlers parenting classes, but would not be able to start parenting classes in Lake County until May 2015. He had a good participation level in the ATV program. However, since moving to Lake County, C.C. had not participated in an anger management program, despite a referral to a program through Lake County Tribal Health.

An "Individual Family Service Plan" was scheduled for November 19, 2014, and Angel cancelled the appointment that day. Because Angel holds education rights for S.C., her presence and participation was required. Angel and C.C. did not respond to attempts to reschedule the appointment until a service letter was provided to them on December 17, 2015. The Agency was concerned about the parents' unwillingness to meet S.C.'s specialized needs. The meeting was rescheduled for December 22, 2014, and the four goals identified for S.C. were: improve receptive language skills; improve expressive language skills; improve social/emotional skills; and improve adaptive behavior/toilet training.

The Agency believed it was not likely that S.C. could return to parental custody, based "on the mother and father[']s pattern of tampering with drug tests and refusing to drug test. Additionally, the child's return to parental custody is guarded due to the lack of the parent's participation and completion of level-I and level-II parenting classes and Anger Management services." The agency recommended termination of reunification services for both parents.

On April 5, 2015, the Tribe filed a notice of tribal intervention, giving it the right to appear in the case pursuant to the ICWA. (25 U.S.C. §§ 1901 et seq., 1911(c).) The court acknowledged the Tribe's intervention in an order dated April 22, 2015.

On April 16, 2015, the Agency filed an addendum to its 12-month status report to provide the results of Angel's psychological examination by Dr. Gloria Speicher that was completed on March 27, 2015, and to provide a report on S.C.'s developmental progress.

Dr. Speicher observed a portion of one of Angel and C.C.'s visits with S.C. She indicated that the parents were observed to encourage learning, and they attempted to engage S.C. with age-appropriate toys and objects. They communicated effectively, listened and encouraged S.C.'s speech development, and modeled appropriate social skills. Angel's psychological testing suggested that she exhibits psychological dysfunction to a mild-to-moderate degree. This meant that in most settings, Angel's functioning was likely adequate, with behaviors that may be considered mildly problematic, and might escalate to a level of being moderately problematic under stressful situations. Angel had a reasonable amount of self-insight and curiosity about her motivations and the motivations of others, but was unable at times to restrain negative or inappropriate impulses. Dr. Speicher recommended continued individual therapy, a 12-step program, continued frequent random drug testing, and continued domestic violence treatment.

The agency filed another addendum to its 12-month status report on April 22, 2015. The addendum provided the court a report from Dr. Taira St. John regarding Angel and C.C.'s participation in therapeutic and anger management services. Dr. St. John had seen Angel and C.C. for individual and couples counseling, and for anger management

14

classes since February 24, 2015. Dr. St. John believed that Angel and C.C. needed education and support to "utilize and expand their skills, talents and apparent love for each other." She recommended parenting classes "every year or two" to boost their understanding and parenting skills. She also recommended professional support and counseling to monitor their progress for a year after reunifying with S.C. She felt they need "couples therapy re gender communications, relational skills, and self-care practice" and should continue anger management classes until they had completed the 52-week program. Dr. St. John recommended that S.C. be returned to Angel and C.C. full time, "perhaps on a graduated schedule the first two months, with all classes and meetings monitored and supported weekly by [the Agency] or a comparable team in Lake County."

The addendum report also reported that C.C. did not show up for required drug tests on April 20 and 21, 2015. Angel tested on April 20, 2015, and the Agency was concerned that she appeared to be "hyper verbal, tangential, and fidgety." Results from the drug test were not yet available.

On April 30, 2015, the Tribe filed the declaration of Percy Tejada, whom the Tribe intended to call as an ICWA expert. Tejada declared that it was the Tribe's intention to recommend continued reunification services for the parents. Tejada believed that the Agency "needs to assess, and reassess all available relatives for placement immediately and place [S.C.] according to the recommendations of the Tribe." He believed that the Agency should be given the discretion to allow tribal home visits with the parents as long as they comply with their case plans. Tejada believed that termination of reunification services would be detrimental to S.C.

The court held a contested 12-month review hearing on May 5, 19, and 26, 2015.

On May 5, 2015, Tejada testified on behalf of the Tribe. He reiterated his recommendation that reunification services be continued. He believed that the parents were committed to successful completion of reunification. He believed that Angel and C.C. had complied with their case plans: "They've had a few hiccups here and there, but overall there's nothing that I could see or identify that would have been a red flag for me." Despite questions about the parents' drug testing, there had as yet been no positive

15

tests except for C.C.'s two tests that were positive for alcohol and Angel's test that was positive after surgery. He believed that the Agency had not complied "with all aspects of the [ICWA] placement preferences." S.C. was not currently in a tribally approved home and he believed that the Agency could have done more to identify a relative home for placement. On cross-examination, Tejada reiterated that the Agency is required to seek out a home that is compliant with the ICWA and he did not see in the record facts showing the Agency sought out such a home.

On May 11, 2015, in response to Tejada's testimony, the Agency filed a third addendum to its 12-month status report to provide information concerning efforts it had taken to locate tribal homes for S.C.'s placement. A distant cousin of Angel was currently being assessed to determine if her home would be an appropriate placement for S.C. On May 15, 2015, the Tribe filed a request for judicial notice of Tribe Resolution No. 15-05-12 A by which the Tribe designated the home of the cousin as the culturally appropriate and tribally approved placement for S.C.

On May 18, 2015, the Agency filed a fourth addendum to the 12-month status report. On May 7, 2015, the Agency referred Angel and C.C. to AODP for a substance abuse reassessment. The assessor found Angel difficult to assess due to her "pattern of absenteeism, avoidance and minimizing." He diagnosed Angel with "polysubstance dependence in remission." He recommended six months of weekly "individual relapse prevention/cognitive behavioral therapy" and a 12-step program. He also recommended that Angel participate in long-term weekly counseling to address bereavement and depression, as well as boundary issues with personal safety. The addendum did not report on a reassessment of C.C. Angel and C.C. arrived on time for a drug test on May 7, 2015. C.C. was unable to produce a sample, despite having four hours' notice. Angel tested negative for all substances. On April 22, 2015, C.C. admitted to the social worker that he had been smoking marijuana "this whole time" and presented her with a prescription for medical marijuana, which expired on April 21, 2015.

When Angel was tested on May 7, 2015, the social worker who collected the specimen observed Angel in possession of an unopened urinalysis test device. When a

16

supervisor asked for return of the device before Angel left the building, Angel denied having it.

At the continued 12-month review hearing on May 19, 2015, Dr. Speicher testified on behalf of Angel. When she observed the parents during a visit with S.C., she observed appropriate social skills and communication skills between the parents and child. She found that C.C. responded to S.C. and allowed her to take the lead; he encouraged her to learn by identifying objects; he engaged her with toys and objects that were age appropriate; he tracked her emotions and shared in her joy; he supported her developing independence; and he was reassuring and calm.

Dr. Speicher testified that Angel has a narcissistic personality disorder, with some obsessive compulsive traits and paranoid features. Substance abuse problems were in remission. This psychological diagnosis would make it likely for Angel to manifest behaviors such as irritability and a lack of tolerance for suggestions from other people. Angel could appear to others as "haughty maybe overbearing and disinterested. A kind of know-it-all attitude." Dr. Speicher testified that the social worker's description in the 12-month status report that Angel was fidgety, with a dry mouth and loud and hyper speech, was consistent with her being anxious. Such behavior could also be indicative of methamphetamine abuse, so Dr. Speicher had concerns, but she was also concerned "about the clarity of coming to . . . that conclusion." She could not conclude that Angel was or was not currently abusing substances without chemical testing. On cross-examination, Dr. Speicher was asked to read the most recent addendum report, and she said that it raised her level of concern, but she didn't "know that much about [Angel's] substance abuse."

Angel testified on her own behalf. She denied tampering with any drug tests. She testified that due to two surgeries she had in 2014, she sometimes had difficulty producing urine on demand. Because she moved to Lake County in late January 2015, services were interrupted because they had to be transferred. She believed herself capable of having S.C. returned to her immediately. Photographs of Angel's house, including the room set aside for S.C., were entered into evidence. She had started a

17

parenting class called Motherhood is Sacred, a 24-week course, in February. She had also completed her communication class at the Family Center. On cross-examination Angel said that she had not consumed any alcohol since 2011 and did not use marijuana. C.C. used marijuana, but not in the home.

Sue Glass, a social worker assistant who supervises visitation at the Ukiah Family Center, testified on Angel's behalf. She had supervised about 14 visits between the parents and S.C. She described the visits as appropriate. Angel was very affectionate. She never saw Angel bring anything inappropriate for S.C. With snacks, Angel might "go a little over on the sugar sometimes but not particularly." S.C. talked about her father, was excited when he arrived, and seemed to have fun with him.

Cassie Quadrelli, the social worker in the case, was called as a witness for C.C. She said that Dr. Speicher's observations of the interaction between C.C. and S.C. was representative of the latest visits. She confirmed that her recommendation for termination of services was based in part on C.C.'s "unwillingness" to complete a parenting class. She "used the term 'unwilling' because he ha[d] been provided multiple opportunities to engage in parenting classes. He did, in fact, try to complete Toddling Toddlers and he only got through about half of the course." C.C. completed four of the eight Toddling Toddlers classes and had participated in Baby Playhouse. Quadrelli stated in her report that C.C. missed parenting class in Lake County because he was too late in registering. She was not aware that when C.C. moved to Lake County, the parenting class to which he had been referred had already started and it was too late to join. As of the end of February, there was no active referral in place for C.C. to take a parenting class in Lake County. She made no attempt to find him another parenting class in Lake County.

Quadrelli's recommendation was also based in part on C.C.'s discontinuation of ATV. Since she wrote her 12-month report, she learned that C.C. had continued in anger management in Lake County with Dr. St. John.

18

Quadrelli acknowledged that Angel's urine test on February 4, for which a creatinine level was the same as C.C.'s February 3 test, was closely observed. No irregularities were observed. Likewise, C.C.'s February 19 test was closely observed.

Angel came to Martin Delgado Martinez, who runs a substance abuse recovery program called Red Road, a program for Native Americans. Angel came requesting services about two years ago. The program teaches life skills, parenting skills and anger management as part of its substance abuse prevention program. Angel signed up and does one-on-one sessions to deal "with some of the issues that she wants clear." He has never been concerned or suspicious that Angel came to Red Road under the influence. He is certified by the state as a Substance Abuse Counselor II and is familiar with the signs of substance abuse, including abuse of methamphetamine and alcohol. He has seen Angel progress in the program: "I see her smiling, being happy. She still gets upset about some things she's going through and being put through. And she's still doing the work."

The Agency called C.C. He had obtained a medical marijuana card to treat ulcers. He used marijuana recently three times. He denied telling the social worker that he had "been smoking the whole time." He was referred to Lake County Tribal Health for a parenting class, but when he went he learned that the class had already started and he could not register.

The Agency called Jesamyn Allen, a social worker for the Agency, not assigned to the case. She was asked to perform a drug test on Angel because Quadrelli was not available on May 7, 2015. While she tested Angel's specimen, Angel turned around to wash her hands. When Allen looked up again "there was a test, a sealed six panel test stuck in the back of her pants with her shirt tucked in behind it." She was very sure of what she saw. She did not question Angel, but she spoke with her supervisor, Dolly Riley. Angel did not display any behavior suggesting she was trying to use someone else's urine or fake her test.

The Agency called Kathleen Agenbroad, the receptionist in the Agency's main building. She was at the reception desk on May 7, 2015, when C.C. and Angel came in

19

for testing.  When Angel came from the testing room, Allen had a clear view of Angel, who was standing and fidgeting with her blouse, pulling at it from the back.  Angel then went to sit down "and grabbed an object from the backside of her pants."  She saw a rectangular object covered by Angel's hand.  Angel sat down, put the object in her bag, looked over at C.C. and smiled.

The Agency called Matt Purcell, a social worker supervisor for the Agency.  He has administered about 500 urinalysis tests.  On February 19 he administered a test to C.C.  C.C. was not able to immediately provide a sample.  He said he needed to run an errand and would be back in 15 to 20 minutes.  When C.C. came back, Purcell called him back into the lab to submit urine.  He wanted to visually observe C.C. urinate because of the tampering suspicions.  He saw C.C.'s penis and C.C. urinated.  Something bothered Purcell about the test so he looked at a website concerning a product called a "Whizzinator," a product that a previous client had used.  It is a contraption that a man straps to himself that has a urine reservoir "and then it actually has a penis and it actually secretes urine into a bottle."  He "saw some strong similarities of [C.C.'s] penis and the penis I saw on the internet" in "the way it was shaped.  And then what kind of bothered me, I realized afterwards was the skin tone difference."

On May 26, 2015, following presentation of evidence and argument by the parties, the court made the following findings:  the parents had partially complied with their case plans; reasonable services had been provided or offered to the parents; the Agency had made both reasonable and active efforts to effect a reunification; a return of S.C. to the parents would create a substantial risk of harm to the child; and there was not a substantial probability that S.C. would be returned to the parents' custody within 18 months of her initial removal.  The court ordered that reunification services be terminated and set a section 366.26 hearing for September 23, 2015.

C.C. timely filed a notice of intent to file a writ petition on May 28, 2015.  Angel timely filed her notice of intent on May 29, 2015.

20

**DISCUSSION**

At the 12-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f).) The court may also extend reunification services "up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of his or her parent" if the court finds "there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(3).)

In their petitions, the parents argue that insufficient evidence supported the juvenile court's findings that (1) return of S.C. to the parents' home would pose a substantial risk of detriment to S.C.; (2) reasonable services had been offered and active efforts to reunify the family had been made; (3) reunification within the 18-month statutory period was not likely; and (4) there was good cause to deviate from the placement preferences of the ICWA.

"The Court of Appeal in reviewing the sufficiency of the evidence in a juvenile court proceeding 'must indulge in all reasonable inferences to support the findings of the juvenile court [citation], and we must also ". . . view the record in the light most favorable to the orders of the juvenile court." ' " (*In re Katrina L.* (1988) 200 Cal.App.3d 1288, 1300.) " 'When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact.' " (*In re Heidi T.* (1978) 87 Cal.App.3d 864, 872.)

21

# I.

***Substantial Evidence Supports the Juvenile Court's Finding That S.C.'s Return to the Parents Posed a Substantial Risk of Detriment to the Child.***

The juvenile court found:  "Based upon clear and convincing evidence, the Court finds that return of the child to the parents would create a substantial risk of detriment to the safety, protection or physical or emotional well being of the child.  The factual basis for the above finding is as set forth in the report of the social worker, in the section entitled 'NECESSITY FOR PLACEMENT.' "  The cited section of the Agency's 12-month status report states:  "Placement remains necessary as the parents have not made significant progress in their case plan to eliminate risk factors that put the child at risk of physical and emotional harm and neglect."

One of the primary concerns of the agency was that prior to C.C.'s imprisonment, Angel had been the victim of C.C.'s domestic violence.  Indeed, it was for an incident of this domestic violence that C.C. received a suspended prison sentence that was reimposed following a probation violation.  Due to this concern, Angel's and C.C.'s case plans included the following objective:  "Attend and demonstrate progress in a County Certified Domestic Violence Prevention Plan."  The Agency's 12-month status case plan update states that the parents were enrolled in the ATV program.  Angel had attended 19 group sessions and one individual session.  C.C. had attended 15 group sessions and one individual session.  When the parents moved to Lake County, they were referred to an anger management program provided through Lake County Tribal Health.  However, the parents had not participated in that program, and the Agency deemed the objective not met.  The Agency's second addendum to the 12-month status report included a report from Dr. St. John stating that the parents "have been enrolled, and have participated in separate gender-specific [ATV] classes."  However, Dr. St. John's report does not indicate how many ATV classes the parents had attended, describe their participation or indicate their progress.  Substantial evidence supports the conclusion that insufficient progress in a domestic violence program had been demonstrated such as would alleviate concern about returning S.C. to a potentially violent home environment.

The other primary concern from the outset of this case was the parents' history of drug abuse. Both parents had the following objective in their case plans: "Stay free from illegal drugs and show your ability to live free from drug dependency. Comply with all required drug tests." The Agency's 12-month case plan update deemed this objective unmet by either parent. Both parents had failed to show up or were late for some required drug tests. Sometimes they were unable to produce urine samples. Close creatinine levels from three of C.C.'s samples and two of Angel's between February 3 and March 9, 2015, justified a suspicion that the same urine was being submitted for different tests. Between hearing dates for the 12-month review, the social worker observed Angel with an unopened urine test kit, an observation substantiated by the Agency receptionist's observation of Angel's behavior after testing, strengthening the suspicion that the parents were tampering with their drug tests. This strong circumstantial evidence of continuing drug use by the parents is substantial evidence that they were failing to meet a case plan objective. C.C.'s subsequent admission to the social worker that he was using marijuana and Angel's testimony that she was aware of that use provide additional substantial evidence that insufficient progress in addressing drug use had been demonstrated such as would alleviate concern about returning S.C. to a home where drugs were used.

Substantial evidence supports the conclusion that the parents had made insufficient progress towards meeting their case plan objectives in two of the areas of greatest concern to the Agency and the court: prevention of domestic violence and cessation of drug use. Accordingly, substantial evidence supported the court's determination that returning S.C. to the parents' home would pose a substantial risk of detriment to S.C.

## II.

### *Substantial Evidence Supports the Juvenile Court's Finding That the Agency Offered Reasonable Services and Made Active Efforts.*

The juvenile court found "by clear and convincing evidence that reasonable services, designed to help the parents overcome the problems that led to the original removal and continued custody of the child, have been provided or offered to the

parents." It also found "by clear and convincing evidence that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

" 'Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' [Citation.] Therefore, reasonable reunification services must be offered to a parent. [Citation.] The reunification plan is 'a crucial part of a dispositional order.' [Citations.] The department must make a ' " 'good faith effort' " ' to provide reasonable services responsive to the unique needs of each family. [Citations.] Moreover, . . . '[t]he plan must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.' " (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010–1011.)

"The standard [for reasonable services] is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) What was required of the Agency was "to 'make a good faith effort to develop and implement a family reunification plan . . . [with] the objective of providing such services or counseling "as will lead to the resumption of a normal family relationship." ' " (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424.) "A proper service plan must be tailored to the specific needs of the dysfunctional family. However, to make the requisite findings, the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

At each review hearing "[t]he court shall consider the safety of the child and shall determine . . . [¶] [t]he extent of the agency's compliance with the case plan in making reasonable efforts, or in the case of an Indian child, active efforts as described in

24

Section 361.7, to return the child to a safe home . . . ." (§ 366, subds. (a)(1) & (a)(1)(B).) "What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).)

The ICWA requires that "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d).) " '[A]ctive' remedial and rehabilitative efforts must be directed at remedying the basis for the parental termination proceedings, and thus the types of required services depend upon the facts of each case." (*In re Michael G.* (1998) 63 Cal.App.4th 700, 713.) "[W]hile the court must make a separate finding under [25 U.S.C.] section 1912(d), the standards in assessing whether 'active efforts' were made to prevent the breakup of the Indian family, and whether reasonable services under state law were provided, are essentially undifferentiable." (*Id.* at p. 714.) "The phrase 'active efforts,' construed with common sense and syntax [citation], seems only to require that timely and affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designed to remedy problems which might lead to severance of the parent-child relationship." (*Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1016.) Because the parents make no argument, and cite no authority, that if reasonable services were offered to the parents, there was nonetheless a failure to make active efforts as required by the ICWA, we do not further address the question of active efforts.

Here, ample evidence that the Agency provided reasonable services and made active efforts is contained in the case plan update that accompanied the 12-month status

25

report. Angel was provided with housing support by the Tribe and the parents had moved into a two-bedroom residence in Lake County; the parents had been provided visitation with S.C.; the parents had been referred to the ATV program; the parents had been assessed to determine the need for drug dependency treatment and were randomly tested for drug use; and the parents had been referred to parenting classes. Angel had been provided a psychological evaluation. Not only had the parents been referred to these services, they had, to some extent, participated in them. The record in this case demonstrates that the services provided were designed to address the issues of primary concern that resulted in the parents' loss of custody (prior drug use, potential for domestic violence, proper parenting of S.C.) and also that the agency maintained frequent contact and communication with the parents.

In arguing that the Agency failed to provide reasonable services or make active efforts, the parents identify three issues with the provision of services: (1) although the Agency had reason to suspect tampering with drug tests in February 2015, and Angel exhibited behavior indicative of drug use, it did not refer the parents for re-assessment to see if additional substance abuse treatment was necessary until May 2015; (2) after C.C. tested positive for alcohol on October 20, 2014, the social worker reported in the six-month status report that she would re-refer him for a substance abuse assessment, but such a referral never occurred; and (3) when the parents moved to Lake County, the social worker referred C.C. to a Lake County parenting class, for which he was not able to register because the class had already started. In raising these issues, the parents fail to appreciate that "in reviewing the reasonableness of the reunification services provided by the Department, we must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

Knowing that the parents were moving to Lake County, the Agency provided C.C. a referral for a parenting class in Lake County on February 3, 2015. At the time the

26

referral was made, C.C. had time to register for the class before it started. The parents moved to Lake County during the weekend of February 7, 2014. C.C. testified that he was told he was too late to register for the class "the first time [he] went to Lake County Tribal Health" and the course had already started. The record does not indicate the date on which C.C. first went to Lake County Tribal Health or that C.C. informed the social worker, Quadrelli, that he was unable to attend the parenting class to which he was referred. Sometime before April 1, 2015, when the Agency filed its 12-month status report on April 1, 2015, Quadrelli became aware that C.C. was not attending a parenting course. On April 9, 2015, C.C.'s counsel asked Quadrelli for a parenting class referral. Quadrelli provided a referral for a communications class at the Ukiah Family Center. We see nothing in these facts indicating that the Agency failed to offer reasonable parenting services to C.C.

It is true, as the parents contend, that after a second positive test for alcohol, the Agency stated its intention in the six-month status report to re-refer C.C. for an ADOP evaluation. The Agency did not do so. However, C.C.'s case plan called only for him to "[s]tay free from illegal drugs" and show his "ability to live free from drug dependency." We find nothing in the record indicating that use of alcohol, as opposed to other drugs, was a concern in C.C.'s case, and nothing indicating that *not* referring C.C. for an ADOP evaluation simply for two documented uses of alcohol use was unreasonable, especially considering that C.C. was subject to frequent random drug testing.

Even though the Agency had a strong and well-founded suspicion that the parents had resumed using drugs, it did not have definitive proof until C.C.'s admission on April 22, 2015, just before the 12-month status review, that he was using marijuana. Without such definitive proof, it was not unreasonable for the Agency not to require reassessment by ADOP. As the juvenile court observed: "[I]f drugs resumed or became a problem at some point in the case, the parents quite actively tried to conceal that from the social worker thereby precluding her from doing anything different. There were no dirty test[s], no definitive evidence that the agency could rely on to say, we need a new assessment in this case. There simply was a lot of uncooperative and just downright sneaky behavior."

27

The parents' reliance on *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340 is unavailing.  In *Amanda H.* the mother's case plan called for individual counseling and separate domestic violence counseling, but the mother only enrolled in individual counseling which conjointly addressed domestic violence.  (*Id.* at p. 1346.)  At the six-month review, the agency indicated that the mother was in compliance with her plan, but just prior to the 12-month hearing the social worker advised the mother of her failure to enroll in separate domestic violence counseling.  (*Ibid.*)  The *Amanda H.* court found that the agency failed to provide reasonable services:  "[The agency] cannot meet the clear and convincing evidence standard when it has told mother and the court for a year that mother was enrolled in the right programs and then, at the 11th hour, used that mistake to ask the court to terminate reunification services."  (*Id.* at p. 1347.)  Both parents claim they were led to believe they were compliant with their services, but such a claim is facetious when the Agency repeatedly informed the parents about its suspicions of drug test tampering and reduced the visitation from level-IV to level-III explicitly because of those suspicions.  This is not a case in which the Agency misled the parents into believing they were in compliance.  If any needed services were not provided, it was the result of the parents misleading the Agency.

Substantial evidence supports the juvenile court's finding that reasonable services were provided to the parents.

### III.

### *Substantial Evidence Supports the Juvenile Court's Finding That Reunification was Unlikely Within the Statutory Time Period.*

By the time the 12-month review hearing occurred, only three months remained before S.C. would have been detained for 18 months, the statutory time period for reunification services.  Thus, the question for the juvenile court was whether there was a substantial probability that S.C. would be returned to the parents' custody within the next three months.  The court found as follows:  "[B]ased on the totality of the evidence, there is not a substantial probability . . . if services were continued [to] 18 months, that the parents could reunify with the child.  And that's based on many things.  [¶]  The fact that

28

the parents have a long standing history of trauma and life difficulties that according to their own therapist, [Dr.] St. John, they need to continue to work on and I don't see that they would be able to, despite her recommendation, to make adequate progress in the next three months to enable reunification. I'm concerned about the results of the psychological evaluation of mother which shows that although mother has made progress and does function well under many circumstances when stressed, her difficulties become more pronounced and I don't believe that in the next three months she would be able to learn sufficient skills to be able to manage a very young child who's not able to care for her own safety. [¶] I'm also highly concerned about the very suspicious and avoidant behaviors that the parents had around drug testing in the last six months. They delayed tests, their test results were suspicious. They engaged in behavior that one would not expect and which is not consistent with parents that are clean and sober and cooperative with drug testing and simply desirous of showing the agency that they are clean and sober."

Dr. St. John reported: "We have met a relatively short time in counseling, and [the parents'] story was fraught with trauma and loss, even before S.C. was born. Therefore, it is my strong opinion that they need long-term counseling and treatment for stress and perspective on their lives and culture, and depth understanding as to how their early experiences have led to their current dilemma. They both had difficult childhoods and betrayals by major caregivers. . . . My feeling is that they need couples therapy re gender communications, relational skills, and self-care practice, including dialectical training for foundational support and understanding, and should continue their ATV classes until they are completed with the 52-week program with final evaluations." Given the depth of therapy that Dr. St. John recommended for the parents, it was not unreasonable for the court to conclude that three months would be insufficient time for the parents to make such progress as would allow the return of S.C. to their custody. Accordingly, Dr. St. John's recommendation is substantial evidence in support of the trial court's finding.

Dr. Speicher's report of Angel's psychological evaluation noted that while Angel was likely to function adequately in most situations, "under situations of stress her

29

behaviors and reactions may escalate to a level of being moderately problematic." The report recommended the following for Angel: (1) a medication evaluation with a psychiatrist might be useful "in consideration of the potential for psychopharmacologic treatment to help alleviate tense feelings"; (2) consideration of a 12-step program and continued random drug testing; (3) continued individual psychotherapy, including "[d]ialectical behavior therapy [to] help her to focus on her current circumstances and reduce the amount of flooding and debilitating anxiety she experiences"; and (4) continued treatment concerning her history of domestic violence. These recommendations tend to corroborate Dr. St. John's report and provide substantial evidence in support of the trial court's finding.

Moreover, in order to continue reunification services past the 12-month review, the juvenile court must find, among other things, "[t]hat the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home." (§ 366.21, subd. (g)(1)(B).) Here, one of the primary concerns leading to the child's removal was the history of drug abuse by the parents. We have already discussed the strong circumstantial evidence indicating that the parents were tampering with their drug tests, reasonably supporting an inference that they were attempting to hide renewed drug use from the agency—an inference also supported by the parents not showing up for some required tests and their inability on some occasions to produce a urine sample. The court found that the parents' behavior was "not consistent with parents that are clean and sober and cooperative with drug testing and simply desirous of showing the agency that they are clean and sober." This finding, supporting a conclusion that the parents had *not* made significant progress toward resolving one of the significant problems leading to S.C.'s removal, was supported by substantial evidence.

**IV.**

***Substantial Evidence Supported the Court's Finding That There was Good Cause to Deviate from the ICWA Placement Preferences.***

The ICWA provides: "In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with— [¶]

30

(i) a member of the Indian child's extended family;  [¶]  (ii) a foster home licensed, approved, or specified by the Indian child's tribe;  [¶]  (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or  [¶]  (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."  (25 U.S.C. § 1915(b).) Section 361.31, subdivision (b), provides the same order of placement preferences in state law.  Good cause to deviate from placement preferences "may include the following considerations":  the requests of the parent or Indian custodian; the requests of the Indian child, when of sufficient age; the extraordinary physical or emotional needs of the Indian child as established by a qualified expert witness; or the unavailability of suitable families based on a documented diligent effort to identify families meeting the preference criteria.  (Cal. Rules of Court, rule 5.484(b)(2).)

The parents argue that "[i]n this case the Hopland Band of Pomo Indians filed a resolution designating [a] tribal relative's home . . . as the culturally appropriate and tribally approved placement for [S.C.] and the Court failed to articulate good cause to deviate from the placement preference."

When the Agency filed its disposition report on May 23, 2014, S.C. had been placed in a tribally preferred foster home.  In August 2014, the foster mother notified the Agency that she would be returning to work and would be unable to provide the level of care that S.C. required.  A tribally approved foster home could not be found, and the tribal representative approved the Agency finding an alternative placement.  The parents do not dispute that there was good cause at that point to make a placement that deviated from the ICWA placement preferences.

In April 2015, a distant cousin of Angel came forward and expressed interest in providing placement for S.C.  The Agency, along with a Tribal representative, interviewed the cousin and assessed her home.  As of May 11, 2015, a background check of the cousin and her husband was in progress and the Agency intended to set up visitation to foster a relationship between S.C. and the cousin's family.  The Agency recommended that regular visitation be set in place but that no placement changes be

31

made until appropriate sleeping arrangements had been established because there was currently no bedroom available for S.C. The Agency filed a log of its unsuccessful efforts in January 2015 to locate a foster home for S.C. that would comply with the ICWA placement preferences.

The Tribe filed its resolution identifying the cousin's home as its placement preference for S.C. on May 15, 2015, between two of 12-month status review hearing dates. On May 26, 2015, after all evidence had been presented, S.C.'s appointed council expressed concern that a move from S.C.'s current foster home, where she was "doing very well" might not be in her best interest. She requested a separate placement hearing so that an expert could perform a bonding assessment of S.C. with the current foster home. Counsel for the Tribe told the court: "Yes, there are some issues in terms of moving around the bedrooms and the family is highly motivated, they are already undertaking that task to make space to make their home a welcoming environment. The Tribe is not asking the Court to move S.C. today. We're asking to create a thoughtful transition plan so that we have an ICWA compliant home that respects the best interest of this child and to transition her there in a thoughtful and gradual way."

On May 26, 2015, the juvenile court made the following findings and orders: "[S.C.'s] out-of-home placement remains necessary. The current placement is appropriate. However, it's incumbent on the social worker to immediately assess the relative and Tribally preferred caretakers that are the subject of the May 13 resolution by the Tribe. [¶] Because the child has been in her current placement with the consent of the Tribe for a period of months and she does have some issues that are currently under assessment, maybe some special needs, I think it is appropriate that we go slow and assess whether it's in her best interest to transition her to the recently approved home of the Tribe. For that reason, I would ask the social worker to start setting up visitation between the family that is identified in the Tribal resolution and I will set a hearing to determine whether change of placement is appropriate." The findings of the court that

32

were filed after the hearing include a finding that there was good cause to deviate from the ICWA placement preferences.[7]

Substantial evidence supports the juvenile court's finding of good cause to deviate from the ICWA placement preferences until a placement hearing could be conducted. It was not clear at the 12-month status hearing that the identified tribal home would be a suitable home for S.C. Background checks were still in progress. The family was in the process of adjusting living arrangements within the home to accommodate S.C., and there was not yet a determination that they had successfully done so. S.C. had special developmental needs and was currently receiving weekly early intervention developmental services with Easter Seals. She had a good prognosis in her developmental needs if "consistent therapy continues in the home." There was as yet no evidence that the identified family was prepared to meet S.C.'s special needs. (See § 361.31, subd. (b) ["Any foster case placement of an Indian child . . . shall be in the least restrictive setting . . . *in which the child's special needs, if any, may be met*," italics added].) The lack of evidence that the identified home would actually be a suitable foster care placement was good cause to deviate from the ICWA placement preferences until all of the evidence the court would need to make a proper placement decision was available.

---

[7] The Agency drafted a set of findings and orders for the court that it included along with the 12-month status report. Among the drafted findings was the following: "The Court finds good cause to deviate from the placement preferences under the [ICWA] on the grounds that there are no identified tribal homes in that [*sic*] are able to provide for the specialized needs of the child." The court signed the findings and orders drafted by the Agency, making certain modifications by hand. Among other changes, the court struck the phrase "that there are no identified tribal homes in that are able to provide for the specialized needs of the child." This resulted in the following finding by the court: "The Court finds good cause to deviate from the placement preferences under the [ICWA] on the grounds" without a statement of the good cause grounds. However, as we explain, there is no doubt that there were good cause grounds to not immediately place S.C. with the identified tribal family.

33

## DISPOSITION

The petitions for extraordinary writ are denied.  This decision is final as to this court forthwith.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____

STEWART, J.


We concur.


_____

KLINE, P.J.


_____

RICHMAN, J.


*Angel C. v. Superior Court* (A145268)